Good morning, Your Honors. If it pleases the Court, I'm Robert Campbell, representing the appellants Araceli and Pedro Rivera. This is an insurance bad faith case involving an Allstate deluxe homeowner's policy purchased by Araceli and Pedro Rivera and the undisputed sudden and accidental discharge of water from a household appliance. The washing machine on the top floor of the Rivera's six-bedroom Oakland Hills home overflowed for at least 15 minutes, causing a catastrophic water damage loss to the downstairs of their home, which had recently been renovated into an apartment where their son lived. The Rivera's promptly reported the loss to Allstate, and Allstate inspected and began investigating the loss. Nine months later, Allstate shut down its investigation and denied the claim, purportedly because the Rivera's failed to cooperate in four separate, but in Allstate's mind, equally important acts of non-cooperation. These four purported acts of non-cooperation were the only reasons why Allstate shut down its investigation and denied the claim. Well, they stopped investigating because they believed there was evidence of fraud. No, Your Honor, that's Well, that's sort of the prompt. It sort of invoked their heightened sort of investigative actions. Your Honor, that's correct. That's correct, what Allstate said in its brief. But I think their testimony as to suspicion of fraud is what controls. There were four people involved in this claim. There was Joan Nelson, who was the technical person. There was Sharon Sullivan, who was the special investigations unit person. There was Janice Burghardt, who was Sharon Sullivan's manager and who independently reviewed and approved Sullivan's recommendation to deny the claim. And there was Donelda Jensen, who actually made the decision to deny the claim. Janice Burghardt's testimony is as follows at ER 123. Did you ever suspect that the water damage claim was fraudulent? Answered, no. Question, have you ever had any reason to believe that anyone at Allstate ever suspected that the water damage claim was fraudulent? Answered, no. I have no reason to suspect that. At ER 123 Well, they were concerned about there may have been damage, but weren't they concerned about the cost of repair and the absence of receipts? The carpet had been, was not available for inspection. The bill that they got from, I forget, CHEM, CHEM, CHEM for your honor. It was 40 some odd thousand dollars. Your honor, the bill for, they looked for receipts. They were asking for receipts. They were asking for them to sign a proof of loss and you can talk about that. Then they asked them to submit to a independent examination. Your honor, CHEMFRI only submitted a bill of $25,000. There's no evidence that that was exorbitant in any way. This was a catastrophic loss to the downstairs. The 40 some odd thousand dollars that Allstate is referring to is the CHEMFRI restoration and mitigation bill plus the estimated cost of repair that was submitted by a company called Baycraft Construction. CHEMFRI gave detailed billing statements which Allstate reviewed and according to the testimony of Joan Nelson who reviewed those bills, she only had a few remaining questions about those bills. She had gone through them page by page with the CHEMFRI representative. With respect to the downstairs carpet, there was actually a piece of carpet that they had. It was about 5 inches by 2 inches. It wasn't the 10 by 10 that ITEL apparently required to provide an estimate of what the carpet was worth, but it was a piece of carpet and it would have given some good idea. The Riveras actually only asked for $800 for the replacement of the carpet, which was $1.70 per square foot. Allstate's representative had measured the downstairs. There was never any question that the carpet was there. They simply had a question as to the value. Joan Nelson testified that the 456 square feet and that she knew that the carpet was worth at least a dollar per square foot. So there was a difference between $456 and the $800. There was an appraisal provision for Allstate and the Riveras to go to if they had any disagreement as to the value. Let me ask you this, moving on just a bit. The request for them to participate in an independent examination, did they ever just say, we're willing to participate or willing to submit to an examination? What happened there? That doesn't seem like that's too onerous. What was the problem? The only attempt Allstate made to take the Riveras' tape-recorded statement, and that's all they asked for, was to send them two letters in one week, some seven months after the claim was submitted to Allstate. Was there anything improper about that request? Well, Sharon Sullivan, I mean – Under the policy, were they entitled to do that, in other words? Sharon Sullivan testified that they were not required by the policy to return, to call back Sharon Sullivan and set up a time for their own recorded statement. She testified that their failure to do that was not a breach of the cooperation clause, and she testified that their failure to do that was not a legitimate reason to deny the claim. I thought there was also evidence that there was a telephone call that week. Excuse me, Your Honor? That there was a telephone call that Mr. Rivera made that week that was not – Mr. Rivera made a telephone call to Sharon Sullivan on the same day that she sent that letter. She never returned that telephone call, even though she was required to do so Mr. Rivera also sent a letter to Allstate two days before he received the denial letter saying, I believe I've done everything I've been required to do. We don't know the answer to that, but the earlier one, does she – is there any dispute about whether that phone call occurred? There is no dispute as to that phone call occurring. There's a – in the excerpts, there's a page from Mr. Rivera's telephone bill showing that he made that telephone call that had lasted one-half of a minute, and – He said he left a message for her? He left a – he testified under oath that he left a message for her asking her to call him back. Says what about it? Nothing? She says nothing about that. She has no reason – she doesn't know whether she returned it or not. She doesn't dispute the fact that she did not return it. And they have no telephone record – Just the fact that there was a message left? There's no dispute that a message was left. There's a telephone record of it being made and there's undisputed testimony – The fact that a call was made doesn't mean a message was left. Excuse me? The fact that a call was made doesn't mean a message was left. Mr. Rivera testified under oath that he left a message and asked Sharon Sullivan to call him back. In fact, Mr. Rivera testified that he frequently – all the times that he called Sharon Sullivan, he was never able to speak with her directly. He only got her message machine and was only able to ask for a call back. But let me – Page 107, line 20 to 108, line 16 in his deposition. At the time that they actually denied benefits, the letter, what was left to do, if anything, from your perspective? There were four things that Allstate was requiring the Riveras to do in order to pay the claim. Let me put it this way. Do you think that had the Riveras complied with all of Allstate's requests at the time benefits were denied by that letter, the last letter? The Riveras were unable to comply with two of those requests, which Allstate has said testified under oath, were separate and equally important reasons for denying the claim. That was the failure to provide the carpet documentation and the failure to provide the prior fire claim documentation. There's no dispute in the record that the Riveras told Allstate after looking for that documentation that they did not have it. Allstate knew that they did not have it, yet they were demanding that as a condition to pay the claim. What seems extraordinary to me is with respect to the fire claim documentation. When Mr. Rivera told Allstate, told Sharon Sullivan, he didn't have that documentation. Sharon Sullivan said that she would have John Fernandez, who was the adjuster on the fire claim at the time, send the documentation to him so that he can send it back to Allstate. John Fernandez never sent that documentation to Mr. Rivera. Sharon Sullivan could have gotten that documentation from John Fernandez directly. Was John Fernandez an independent adjuster? No. He was an Allstate claims adjuster. Why didn't she just get it from him? I don't know why she didn't just get it from him. She could have, but she was demanding it from Mr. Rivera, and that's why they denied the claim. I would like to briefly talk about the proof of loss. The proof of loss form, there's an issue in Allstate's mind of whether or not it was signed. Araceli Rivera testified under oath that that was her signature, that she signed it. Nobody else signed it, and it was notarized. She signed it kind of in an odd place. Up at the top, rather than at the bottom. Right. Nine out of ten people would have probably signed it on the bottom, but she signed it on the line that said insured's name, and she thought that that's where it was supposed to be signed. The notary testified that Araceli told her that Araceli believed that that's where she was supposed to sign. That was the only line that said insured's signature. But there was some statement in the briefs that this is not her signature, that it doesn't look like her other signatures. Is there any? Well, Allstate is comparing a signature that she provided on an authorization to release information that she gave to Allstate. But those signatures, to me, look close. They look about the same. Nobody signs their name exactly the same every time. There's no expert testimony. There's nothing except fanciful conjecture that that's not her signature. She testified under oath that that was her signature. That's as good as signing the document again. But you refused to sign the document again, which was very odd. It wasn't odd. She testified, and I'll read her testimony, that she said, so will you sign? The question was, so you will sign at the bottom today? She says, no, because I feel that it is signed. That is my signature. They have compared it with the checks and everything. That is my signature and nothing else. No one else has signed it. It was I who signed it. I want to tell her, why do we have to proceed long in this case, et cetera, et cetera, et cetera. It stresses me. And she says, because of that, they are trying to say that I'm lying. If she felt that if she signed it again, she would be admitting that she had lied about saying that that's her signature and that she didn't want to admit to something that wasn't true. With the — Why don't you — your time's up. Why don't we — I'll give you a minute on the file. Thank you. Good morning, Your Honor. Letitia Todd for Allstate. I'd like to emphasize that the sole issues in this case are three. Number one, was there a breach of the cooperation clause by the Riveras? Two, regardless of whether or not there was a breach, was it reasonable for Allstate to conclude there was a breach? And three, is there clear and convincing evidence of conduct warranting punitive damages? With respect to the first issue, cooperation, I want to also emphasize that Allstate was waiting for the signed proof of loss for two years. That is undisputed. It is also undisputed — We eventually got it, right? No. We still haven't gotten it during — So then you don't accept the form that's signed? I beg your pardon? The proof of loss form. Yes. The one that counsel just referred to. Yes, yes, yes. And the way — the manner in which Ms. Rivera signed it. Right. That's unacceptable to you? Well, she refused to sign it during her deposition when we presented it to her. Well, forget about that for a moment. You refused to accept the fact that she testified that she signed it at the top, irrespective of what the notaries had testified to. Even if a reasonable — What difference does it make where she signed it? Let me ask you that. It does make it — well, the question — What difference would it make to sign it on the side? Would that make a difference? Your Honor, if you'll look at the proof of loss, I have the original right here. Where it is signed, it says insured's name. If that really is her signature, and her signature is Pedro Ampersand Araceli Rivera, then this document fails to identify who is doing the swearing. This is not a case where there's a mark in the side of the document or a mark on the bottom or a mark somewhere else. But if there was any doubt, doesn't the testimony of the notary public, the notary, doesn't that take care of it? But even if a jury would believe that this is a signature, the question then rises, did that arise or did that amount to cooperation as a matter of law under the policy? But if you had a tribal issue of fact, then — No, Your Honor, it's not — Wait. No. Compliance is not an issue of fact. That's a question of law that the judge has to decide? Well, it can only go to the jury if there is a genuine dispute regarding cooperation. And there can be no genuine dispute that from looking at this document, the proof of — What's the purpose of the proof of loss? To verify — Where do you want to insure by that document? The purpose of the signed proof of loss is to verify that the loss occurred as it has been described. This was not a regular claim where arguably a proof of loss would have been less important. This was a claim that was in the special investigative unit where fraud had been suspected. Therefore, a signature and a swearing of the account was tantamount. There's nothing more important than a signature to a proof of loss in this case. Well, she said that was her signature on the proof of loss form. Yes, Your Honor, but the next question arises is that does that amount to cooperation? And the only answer to that question under Hickman is no. The Hickman doctrine says that only a voluntary return and an offer to cooperate will constitute cooperation once an insurance company has denied a claim for failure to cooperate. Here, the insured — Do I have a hand? The Hickman doctrine says that once an insurance company denies a claim for non-cooperation, it has no duty to reopen the claim unless the insured comes back and voluntarily offers to cooperate. Here, the insured knew by the latest — So under that doctrine, the way you're reading it, that she would have been required to come in and sign the document again. She would have been required to come in and at least clarify the situation because they were completely silent, Your Honor. Allstate sent the letter — Does her deposition testimony take care of that problem? Her deposition testimony did not occur until the tail end of discovery a few weeks before Allstate — That's my question. Did her answer to that deposition question take care of the problem? She clarified what happened. Well, it doesn't — Your Honor, I think the question is does that constitute cooperation? And the answer under Hickman is no, because there was no voluntary return. Compelled deposition testimony is not a voluntary return. Ms. Rivera wrote a letter, which perhaps crossed in the mail, where he said, I think we've done everything. Is that right, essentially? And at about the same time, two days later, a letter was sent denying. Is there anything in the record about whether the company received the letter before they wrote the denial letter? Apparently, Your Honor, those letters had crossed in the mail. All right. But so — but they did get a letter saying essentially, you know, we think we've done everything and didn't respond with any — at that point, was that not a sufficient offer to do whatever else needed to be done if something else needed to be done? Your Honor, that letter did say, we believe — let us know if there's anything further that needs to be done. Allstate — Why is that then? Why isn't that an offer, a voluntary offer to sign at the bottom if you wanted to sign at the bottom? Because they — the question in their letter was, is there anything else that needs to be done? And Allstate, at the same time, had sent them the denial letter saying, your proof of loss needs to be signed. You need to appear for a recorded statement. They clearly knew at that time what else needed to be done. Did Allstate ever say that we're going to have a recorded statement on such-and-such a day in such-and-such a place? No, Your Honor, but the law does not require it. No law requires an insurance company to actually set a date and time and wait and see whether or not the insured is going to show up. In fact, the Rivera's position is that they can sit there and ignore Allstate's letters and not respond. There was also a phone call. Is there any dispute about that? Well, there's no dispute for the purposes of this motion that the phone call occurred. However, the relevance of that phone call is what's in dispute. The Rivera's are arguing that in that phone call, they were saying that they were responding to Allstate's request for a recorded statement. That is not possible because it is undisputed that Allstate requested the recorded statement formally that same day by a letter. You're also relying on – I mean, this is slightly talking out of both sides of your mouth because you also, in your briefs, repeatedly talk about the previous seven letters which said we're going to have to do a recorded statement. So it's perfectly reasonable that at the same time that you realized it was now time to do the recorded statement, you realized it too. So it's calling to set it up. At least to return the phone call, we could have gotten the thing sent and we wouldn't be having this argument. Well, Your Honor, those previous letters set the background for this. In other words, this isn't a situation where a month went by and the insurers didn't cooperate. This was nine months and ten different letters had gone out. And indeed, throughout the entire litigation, the Rivera's remained completely silent about whether this proof of loss was signed or not and about the recorded statement. And they didn't say anything until they were compelled to do so in their depositions, which was more than two years after the loss occurred. Under that standard, there can be no cooperation. And I'd also like to – It is true that this proof of loss is notarized, which is a little bit of a clue that somebody thinks there's a signature. Otherwise, it wouldn't be a notary. Well, the notarization raises questions about the notarization, not about the signature. And this brings me into the point about the bad faith cause of action. Because regardless of how the Court rules on a breach of contract, Allstate's conclusion that there was no cooperation is reasonable as a matter of law. The documents and information Allstate had in front of it at the time it denied the claim was this document, which any reasonable person would say has no signature. Even Mr. Campbell said nine out of ten people would say this document is not signed. It's a very hard document, though, because ordinarily when you come to a signature from a client that has to be notarized, it says something like, I attest that everything that I said previously is true and so on. There's no statement like that. Your Honor, actually there is. It's the paragraph that's right above the furnishing of this blank. It says the said loss did not originate, blah, blah, blah. That is the swearing paragraph. Where is it swearing? I mean, it's not a traditional kind of swearing statement. Well, Your Honor, again, looking at this from Allstate's perspective, in my personal experience, obviously, doing a lot of insurance work, I've never seen a proof of loss signed up here. But regardless, from Allstate's perspective, I think it was reasonable for it to look at this and say, wait a minute, this isn't signed, and write them a letter and say, you haven't signed it. That's exactly what they did. The Rivera's never responded to that letter. Now, they're claiming they never got that letter and mysteriously went astray even though it was properly addressed. However, Allstate did not know that they claimed they never got the letter until after it moved for summary judgment. So Allstate was left thinking that the Rivera's knew the proof was unsigned and were doing nothing about it. The same thing for the recorded statement. Sometimes we, this strikes me as the kind of case in which there was a major failure of the communications of both sides. Did our court mediation unit attempt to mediate this case? Yes. And it didn't resolve itself? No. Was there an affirmative response to the inquiry? Yes, we'd like to participate in mediation. Yes, Your Honor. Is there any point in trying to do it again now? Would there be any interest in having, sometimes what we do is we suspend submission of the case and ask the mediators to explore with the parties whether they'd be interested in mediating. You know, there may be, our client may be interested in that. I'll have to go back to them and obviously it will depend on what the Rivera's say. But in any event, I would also like to address the continuing good faith argument. It is true that there is a continuing duty of good faith. However, the plaintiffs misquote and misapply the Shade Foods standard. In Shade Foods, the court held that if an insurer does not reopen a claim upon receiving new information, that may fortify bad faith if it was accompanied by an early closure of the claim. Here, there was no early closure of the claim. Allstate had kept the claim open for nine months and still it was not receiving information that it requested from the Rivera's. From its perspective, it was being ignored on a signature for proof of loss. It was being ignored for its request for a recorded statement. Thank you. Thank you, counsel. All right, counsel, you have one minute. Would you address Judge Prezan's inquiry to counsel about mediation? We went through mediation. I don't know that it would be that helpful again. It might be, but I'm not sure that it would be. I would like to speak quickly on the proof of loss itself. Even if Allstate reasonably believed that that wasn't signed and reasonably had a good cause not to go and ask the notary, the proof of loss, the signature on the proof of loss only verified the information that was placed on that form. And those were only three pieces of information. That the loss occurred on July 20, 2000. That the Riveras occupied the premises and that the estimated amount of the loss was $50,000. That is mighty confusing, actually, what's written here. The proof of loss form is in ER338. I know. And it says, isn't this the form that says the whole loss and damage is $20,000 and the amount claimed is $50,000? Well, you know, they're not asking the same question. There were two items of damages. There was the cleanup costs and there was the reconstruction costs. And I think that that's what the difference in those two values was. That the $20,000 was for the reconstruction costs and the whole loss damage was including the cleanup costs. But just going to the proof of loss form, Allstate's testimony is unequivocal that no signature was needed on the proof of loss form to verify six important things about the claim. That the washing machine overflow occurred on July 20, 2000. That the overflow was sudden and accidental. That the overflow caused damage. That the cleanup costs were reasonable and necessary. That the cleanup costs were covered by the policy and that the reconstruction was accurate and reasonable. Allstate is also saying with respect to the recorded statement that they had questions that they wanted to ask the Rivera's and that that's all they wanted to do was to ask those questions and clear it up. The testimony from Sharon Sullivan and it's in the record is that she did nothing for the first seven months to try to take the recorded statement. That all she did was send those two letters. That that wasn't enough and that wasn't a legitimate reason. Allstate had an obligation to pay the claim earlier if it could have taken that recorded statement earlier and had those questions answered. Thank you. Thank you, counsel. We appreciate your arguments. Thank you, counsel. No matter. Martin. I'm Martin. Rivera versus Allstate.
judges: Hawkins, Paez, Berzon